IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BRANDON ADAMS, #227 841,      )
                              )
        Plaintiff,            )
                              )
        v.                    )     CASE NO. 2:19-CV-10-MHT-CSC
                              )            [WO]
                              )
LT. COUSIN, et al.,           )
                              )
        Defendants.           )

\*      \*      \*      \*      \*      \*

BRANDON ADAMS, #227 841,      )
                              )
        Plaintiff,            )
                              )
        v.                    )     CASE NO. 2:19-CV-12-MHT-CSC
                              )            [WO]
                              )
PATRICE RICHIE, et al.,       )
                              )
        Defendants.           )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I. INTRODUCTION

The above-styled 42 U.S.C. § 1983 actions are before the Court on Complaints filed

by Brandon Adams ["Adams"], an indigent state inmate. Adams complains that he was

subjected to unconstitutional conditions of confinement and denied adequate medical care

during his incarceration at the Bullock Correctional Facility. Specifically, Adams alleges

the smoke detection and sprinkler systems in the facility's Restricted Housing Unit

("RHU") were inoperable in September and October of 2018. *Adams v. Cousin*, Case No.

2:12-CV-10-MHT-CSC (*Adams I*), Doc. 1 at 2–3; *Adams v. Richie*, Case. No. 2:19-CV-12-MHT-CSC (*Adams II*), Doc 1 at 2–3. Adams also challenges his access to medical treatment and the adequacy of such treatment provided to him for smoke inhalation. *Adams I,* Doc. 1 at 3; *Adams II*, Doc. 1 at 3.[1] The named defendants are Lt. Cousins, Lt. Griffin, Sgt. Lambert, Sgt. Clemons, Officer Cottrell, Warden Patrice Richie, Warden Gwendolyn Babers, Warden Antonio McClain, Capt. McCovery and Capt. Lamar, correctional officers assigned to Bullock at the time relevant to the allegations made in the Complaint (collectively, "the correctional defendants"), the Alabama Department of Corrections ("ADOC"), and Wexford Health Sources, Inc. ("Wexford"), the medical provider for the Alabama Department of Corrections during the relevant time period.[2] For relief, Adams request $5 million in damages for the alleged constitutional violations. *Adams I,* Doc. 1 at 4; *Adams II*, Doc. 1 at 4.[3]

Defendants filed Written Reports and relevant evidentiary materials, including affidavits, internal incident reports, and medical records, addressing the claims presented

---

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk of this Court in the docketing process.

[2] In the Complaint filed in *Adams I*, Adams incorrectly identified Defendants Cousins and Cottrell as, respectively, "Lt. Cousin" and "Officer Contrell."

[3] Upon a liberal construction of the Complaint, the Court construes the Complaint to present claims against the defendants in both their individual and official capacities.

by Adams. In these filings, Defendants deny that the conditions or medical treatment about which Adams complains violated his constitutional rights.

The Court issued Orders directing Adams to file a response, supported by affidavits or statements made under penalty of perjury and other evidentiary materials, to the arguments set forth by Defendants in their reports. *Adams I*, Doc. 31 at 2; *Adams II*, Doc. 35 at 2. The Order specifically cautioned the parties that "**unless within fifteen (15) days from the date of this order a party files a response in opposition which presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to the order] and **without further notice to the parties** (1) treat the special report[s] and any supporting evidentiary materials as a motion to dismiss or motion for summary judgment, and (2) after considering any response as allowed by this order, rule on such dispositive motion in accordance with the law." *Adams I*, Doc. 31 at 3; *Adams II* Doc. 35 at 3. Adams filed unsworn responses to these Orders therefore the Court has not considered them.[4] *Adams I*, Doc. 34 and *Adams II*, Doc. 38.

---

[4] This Court declines to consider Adams' responses to Defendants' reports because these responses (Doc. 15 at 1–12) are not sworn statements or signed with an averment that they were made under penalty of perjury. *See* 28 U.S.C. § 1746; *Holloman v. Jacksonville Housing Auth.*, 2007 WL 245555, *2 (11th Cir. Jan. 20, 2007) (noting that "unsworn statements, even from *pro se* parties, should not be considered in determining the propriety of summary judgment."); *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980) (holding that "the court may not consider [the *pro se* inmate plaintiff's unsworn statement] in determining the propriety of summary judgment.").

Pursuant to the Orders directing a response from  Adams, the Court deems it appropriate to treat Defendants' reports as motions for summary judgment.  Upon consideration of Defendants' motions for summary judgment, the evidentiary materials filed in support thereof, and the sworn Complaints, the Court concludes that summary judgment is due to be granted in favor of Defendants.

## II.    STANDARD OR REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam); Fed.  R.  Civ.  P.  56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the non-moving party has failed to present evidence to support some element on which it bears the ultimate burden of proof. *Id*. at 322−324.

When Defendants meet their evidentiary burden, as they have, the burden shifts to Adams to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that the court should consider facts pled in a plaintiff's sworn complaint when considering summary judgment). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant, materiality is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. However, "mere conclusions and unsupported factual

allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. At the summary judgment stage, this court should accept as true "statements in [Plaintiff's] verified complaint, [any] sworn response to the [Defendants'] motion for summary judgment, and sworn affidavit attached to that response[.]" *Sears v. Roberts*, 2019 WL 1785355, *3 (11th Cir. April 24, 2019); *see also United States v. Stein,* 881 F.3d 853 (11th Cir. 2018) (holding that a plaintiff's self-serving and uncorroborated, but not conclusory, statements in an affidavit or deposition may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . 'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'"). However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit or deposition will not create an issue of

fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the court, a *pro se* litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's *pro se* status alone does not mandate this court disregard elementary principles of production and proof in a civil case. Here, Adams fails to demonstrate a requisite genuine dispute of material fact to preclude summary judgment on his claims against Defendants. *See Matsushita*, 475 U.S. at 587.

## III. DISCUSSION

### A. Sovereign Immunity

To the extent Adams' request for relief is construed to seek monetary damages from the individual correctional defendants in their official capacities, they are entitled to sovereign immunity. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). As the Eleventh Circuit has held,

the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]. There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute. Waiver may not be implied. Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted); *Papasan v. Allain*, 478 U.S. 265 (1986) (finding that unless the State consents to suit or Congress has abrogated the State's immunity, which has not occurred, Plaintiff cannot proceed against it as the action is proscribed by the Eleventh Amendment and "[t]his bar exists whether the relief sought is legal or equitable."); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (finding that "[t]here can be no doubt . . . that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit."); *Stevens v. Gay,* 864 F.2d 113, 115 & n.5 (11th Cir.1989) (noting the Eleventh Amendment bars a § 1983 action against a State and its agencies regardless of the relief sought). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir. 1990)). Thus, the Alabama Department of Corrections ("ADOC") is an extension of the State, and, as such, is absolutely immune from suit.

Moreover, the law is likewise clear that a state official may not be sued in his official capacity unless the State has waived its Eleventh Amendment immunity, *see Pennhurst*

*State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated

the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).  As previously

stated,

> [n]either waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14.  The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849.

In light of the foregoing, the correctional defendants are entitled to sovereign

immunity under the Eleventh Amendment for claims seeking monetary damages from them

in their official capacities.  *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157

F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities

are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace

Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are

unavailable from state official sued in his official capacity).

## B.    Qualified Immunity

The individual correctional defendants also raise the defense of qualified immunity

to the claims lodged against them in their individual capacities.  *Adams I*, Doc. 30 at 2;

*Adams II*, Doc. 17 at 3.   "The defense of qualified immunity completely protects

government officials performing discretionary functions from suit [for damages] in their

individual capacities unless their conduct violates 'clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  *Gonzalez v. Reno*,

325 F.3d 1228, 1233 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "The purpose of the qualified immunity defense is to protect[] government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010) (internal quotations and citations omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citations and quotation marks omitted). "Unless a government agent's act is so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor is immune from suit." *Lassiter v. Ala. A&M University Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994). The Eleventh Circuit has determined that the law is "clearly established" for purposes of qualified immunity "only by decisions of the U. S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins v. Talladega City Bd. of Education*, 115 F.3d 821, 826–27 n.4 (11th Cir. 1997). The Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). Qualified immunity, however, is only an affirmative defense to a request for damages, the sole relief sought in this case; it has no impact on requests for declaratory or injunctive relief. *See Wood v. Strickland*, 420 U.S. 308, 315, n.6 (1975) ("Immunity

from damages does not ordinarily bar equitable relief as well."), *overruled in part on other grounds by Harlow v. Alexander*, 457 U.S. 800 (1982); *American Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991) (holding that the defense of qualified immunity is limited to actions for monetary damages and does not serve as a defense to actions seeking equitable relief).

"To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." *Gonzalez*, 325 F.3d at 1234. In this case, it is clear "that the [correctional] defendants were acting within their discretionary authority[]" as correctional officials at the time of the incidents at issue so "the burden shifts to [Adams] to show that qualified immunity is not appropriate." *Id.*; *see also Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). To meet this burden, Adams must prove both that "(1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir.2004); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (same); *Youmans*, 626 F.3d at 562 (citation omitted) ("[O]nce a defendant raises the defense [of qualified immunity and demonstrates he was acting within his discretionary authority], the plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was clearly established at the time of the violation."). This Court is "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated." *Id.*; *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (*citing Pearson*,

555 U.S. at 241–42) (holding that a court may analyze the elements "in whatever order is deemed most appropriate for the case.").[5]

## C.    The Conditions Claim

Adams complains of an inoperable smoke detection and sprinkler system in Bullock's RHU in September and October of 2018. These conditions, Adams claims, subjected him to cruel and unusual punishment violative of his constitutional rights. *Adams I* at 2–3; *Adams II* at 2–3.

The correctional defendants deny that the challenged conditions rose to the level of constitutional violations. Nathan Safford, a maintenance supervisor for the ADOC employed at Bullock, submitted an affidavit in which he addresses the allegations presented

---

[5]With respect to the immunity defenses, Defendant Wexford, a private medical provider contracted to provide medical treatment to Alabama inmates, asserts it is likewise entitled to sovereign and qualified immunity. *Adams I*, Doc. 13 at 3; *Adams II*, Doc. 15 at 3. However, the Court finds that qualified immunity does not extend to this defendant. *Hinson v. Edmond*, 205 F.3d 1264, 1265 (11th Cir. 2000) (holding that a physician employed by a private, for-profit corporation contracted to provide medical care to inmates "is ineligible to advance the defense of qualified immunity."); *Edwards v. Ala. Dep't of Corrs.*, 81 F.Supp.2d 1242, 1254 (M.D. Ala. 2000) (holding that a private entity contracting with a state to provide medical services to its inmates "is not entitled to qualified immunity…."); *see also Richardson v. McKnight*, 521 U.S. 399, 408–12 (1997) (holding that because of the influence of market forces on private employers qualified immunity did not extend to prison guards who were employed by a private, for-profit corporation that had contracted with the state to manage the prison). In addition, for similar reasons that the *Hinson*, *Edwards* and *Richardson* courts declined to extend the doctrine of qualified immunity, this Court finds that the medical defendant is not entitled to sovereign immunity as such is reserved for the State and its employees.

by Adams regarding the fire detection and sprinkler systems in the RHU. According to Mr. Safford:

> [t]here is a fire suppression wet sprinkler system throughout Bullock's Restricted Housing Unit. In my capacity as Bullock's Plant Maintenance Supervisor, I monitor this system, which consists of individual sprinkler heads installed in each cell located within the Restricted Housing Unit as well as a sprinkler head installed in the Restricted Housing Unit hallway. The sprinkler heads automatically activate when they encounter a certain level of heat.
>
> It is my understanding that an inmate is mistakenly claiming that the sprinkler system in Bullock's Restricted Hou sing Unit was not working in September and October, 2018, specifically September 22, October 19 and October 22, 2018. This inmate's claim is not correct. The sprinkler system in Bullock's Restricted Housing Unit, which I monitor, was working properly throughout September and October, 2018.

*Adams I,* Doc. No. 29-1 at 1; *see also Adams II,* Doc. 34-5 at 4 (Affidavit of David Lamar).

In her affidavit filed in *Adams I*, Warden Patrice Richie states that:

> A working operational fire sprinkler system is located throughout Bullock's Restrictive Housing Unit and was located there [during the time made the basis of Plaintiff's Complaint]. Specifically, there is a fire sprinkler installed on the main hallway of the Restrictive Housing Unit. Also, there are individual fire sprinklers located in each inmate's restrictive housing unit's cell above the mirror near the toilet. These emergency fire sprinklers automatically activate when they encounter a certain level of heat.
>
> On [the dates referenced in the complaint], any heat/smoke created by the Restrictive Housing Unit's inmates' effort[s] to start a fire in [their] cells [were] not enough to trigger or activate the emergency fire sprinkler system located in Bullock's Restrictive Housing Unit's cells or hallway.

*Adams I,* Doc. 29-2 at 2–3.

In the present case, Adams must present evidence that Defendants acted with deliberate indifference in violation of the Eighth Amendment with regard to the alleged

conditions of the RHU at Bullock. *See Hope*, 536 U.S. at 736. A plaintiff's burden is high in a deliberate indifference case, but it is not insurmountable.

For a plaintiff to demonstrate an Eighth Amendment deliberate indifference violation regarding conditions of confinement, the Supreme Court has held that

> a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious …; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities[.] For a claim … based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.
>
> The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment …. To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety[.]

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal marks, citations, and footnote omitted).

A plaintiff must satisfy both an objective and a subjective test. *Id.* The objective component requires an inmate to show first that "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1028-1029 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Regarding the subjective component,

> the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

the inference . . .The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-38; *see also Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) (finding that "[p]roof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety . . . . It is obduracy and wantonness, not inadvertence or error in good faith, which characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]" *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "Merely negligent failure to protect an inmate . . . does not justify liability under section 1983[.]" *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990).

Viewing the evidence in a light most favorable to Adams, as the Court must do when ruling on a motion for summary judgment, the undersigned finds that despite his allegations, Defendants are nevertheless entitled to qualified immunity on Adams' claims because the evidence of record, viewed in Adams' favor, shows no wanton disregard of the challenged conditions. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986) (finding a prison official must wantonly disregard prison conditions for an Eighth Amendment violation to occur); *Pearson*, 555 U.S. at 232 (finding a defendant is entitled to qualified immunity if a plaintiff fails to demonstrate a constitutional violation). And Adams presents no evidence that the Defendants failed to act or that they acted in a deliberately indifferent

manner.[6] The uncontroverted testimony of Defendants Richie and Lamar and maintenance supervisor Nathan Safford regarding the condition of the fire detection and suppression system in Bullock's RHU is fatal to Adams' deliberate indifference claim as to this prison condition, and Adams has not otherwise produced any evidence that any defendant acted obdurately or wantonly, with a sufficiently culpable state of mind, regarding the condition about which he complains.

There is no evidence that any defendant wantonly disregarded or was deliberately indifferent to Adams' Eighth Amendment rights regarding the conditions in the RHU at Bullock that are the subject of Adam's Complaint. Thus, Adams has failed to meet his burden of showing that Defendants committed a violation of a constitutional right, and they are entitled to qualified immunity on this claim. *See Hope*, 536 U.S. at 736.

---

[6]The Court notes in Adams' unsworn responses his reference to a report issued by the Department of Justice ["DOJ"] on April 2, 2019, which Adams claims shows DOJ investigators found the sprinkler system in the Restrictive Housing Unit at Bullock inoperable. *Adams I*, Doc. 34 at 3; *Adams II*, Doc. 38 at 1–2. The Court reviewed this report in which the DOJ acknowledges that its investigators did not conduct an on-site investigation at Bullock. *United States Department of Justice Investigation of Alabama's State Prisons for Men – Report of April 2, 2019* at 4. *Available at https://www.justice.gov.* Although, the report does state that "[a] February 2017 inspection by engineering consultants hired by ADOC noted that not a single facility has a working fire alarm[,]" *Department of Justice Report* at 46, the report does not address specific conditions at Bullock in 2019 or the conditions of the alarm and sprinkler system at that time. Thus, contrary to Adams' assertion, the report contains no evidence that investigators inspected the sprinkler or fire alarm systems in the RHU at Bullock in 2019 nor that they found these systems inoperable. Moreover, the report is devoid of any finding regarding operability of the sprinkler system in the RHU at Bullock.

## D.     The Medical Claim

Adams claims Defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment when they denied and refused him adequate medical care on September 22, 2018, October 19, 2018, and October 22, 2018. While the Complaint is sparse on facts, the Court understands Adams to challenge the adequacy of medical care he received after he was exposed to smoke in the RHU. *Adams I,* Doc. 1 at 2–3; *see also* Docs. 12, 29; *Adams II*, Doc. 1 at 2–3; *see also* Docs. 13, 34.

To prevail in a suit based on an Eighth Amendment claim regarding a denial of constitutionally adequate medical attention, a prisoner must show at a minimum that prison or medical officials have acted with deliberate indifference to serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000). Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). To demonstrate a denial of medical care in violation of the Eighth Amendment, Adams must prove both an objective and subjective component. The objective element requires Adams to demonstrate the existence of an "objectively serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir.2003). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. (quotation marks and citation

omitted). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (quotation marks and citation omitted).

The subjective component of Adams' medical claim requires that he demonstrate "deliberate indifference" to a serious medical need. *Farrow*, 320 F.3d at 1243. Deliberate indifference is shown by establishing that a defendant had actual knowledge or awareness of an obvious risk to a plaintiff's serious medical need and failed to take steps to abate that risk. It may be demonstrated by either actual intent or reckless disregard. *See Farmer*, 511 U.S. at 834. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference." *Id.* at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding a defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). "[A]an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

"Deliberate indifference" also entails more than mere negligence. *Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 835. "Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." *Hill*, 40 F.3d at 1187 (quotation marks and citations omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical

needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Id*. Further "whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quotation marks and citation omitted).

The correctional defendants submitted affidavits, incident reports, and other prison records to support their dispositive motion. Review of this evidence reflects that fires were started by inmates in Bullock's RHU on September 22, 2018, October 19, 2018, and October 22, 2018. Docs. 29-3, *Prison Documents*; Doc. 29-5, *Affidavit of Waylon Cousins*. Adams' started the September 22, 2018, fire by using a damaged light fixture to light clothing and other materials on fire which he then threw out of the trap hole of his cell door. Doc. 29-5; *see also* Doc. 29-6, *Affidavit of Anthony Lambert*. Adams also flooded the hallway of the RHU with toilet water containing feces. *Id.* After extinguishing the fire—which did not trigger the water sprinkler, set off the fire alarm, or require use of the fire extinguisher—officers escorted Adams to the health care unit. *Id.*; *see also* Doc. 29-2, *Affidavit of Warden Patrice Richie*. Because medical staff was involved in a more serious medical incident at the time and because Adams did not require immediate medical attention, correctional staff returned him to his cell until medical personnel could examine him. Doc. 29-5; Doc. 29-6. Upon being called back to the infirmary, Adams told prison

staff he would refuse to exit his cell if he had to be placed in handcuffs. *Id.* Defendant Lambert ordered Adams to turn around to be handcuffed to the back or he would not be allowed to exit his cell. *Id.* Adams refused to comply with the guard's directive. Doc. 29-6 at 2. Because Defendant Lambert did not observe Adams to be under any distress and there was no smoke inside the cell, the guard did not require Adams to leave the cell. *Id.* Adams was subsequently moved to another RHU cell, however, because of the damaged light fixture. *Id. Adams I*, Doc. 29-6 at 1–2, *Affidavit of Anthony Lambert*; Doc. 29-5 at 1–2, *Affidavit of Waylon Cousins*.

Adams complains of additional incidents of fires in Bullock's RHU on October 19, & 22, 2018. The correctional defendants' evidence includes incident reports dated October 19 & 22, 2018. Doc. 29-3 at 1, 31. The October 19, 2018, incident report reflects that prison officials noted the presence of smoke in the RHU at 12:38 p.m. coming from underneath the cell door of inmate Corey Gardner. Doc. 29-3 at 1. Correctional staff used a fire extinguisher to put out the fire and escorted inmate Gardner out of his cell to the infirmary for a medical assessment. *Id.* At 1:04 p.m. correctional personnel escorted the other RHU inmates to the healthcare unit for a medical exam. *Id.* All the inmates were then released back to their assigned cell in the RHU. *Id.* Adams' body chart indicates he advised medical personnel that his cell was smoked out which "damn near choked [him] to death." *Id.* at 13. Medical staff found Adams to be alert and oriented, in no apparent distress ("NAD"), verbal, and ambulatory, and observed no injuries. *Id.* On October 22, 2018, at 6:05 p.m. correctional officers saw inmate Gardner standing at the entrance of his cell starting a fire.

*Id*. at 31. The fire was extinguished with a fire extinguisher and inmate Gardner and his cellmate were escorted to the medical unit for examination. *Id*. The remaining inmates in the RHU were then taken to the infirmary for a medical assessment. *Id*. Adams' body chart indicates that his statement to medical staff was simply "fire." *Id.* at 55. Medical personnel noted Adams had no injuries. *Id*.

### i. The Correctional Defendants

The correctional defendants deny they acted with deliberate indifference to Adams' medical needs regarding the challenged incidents and deny any other involvement with Adams regarding his claims alleging a denial of access to medical treatment and maintain he had access to such treatment at all times while incarcerated at Bullock. It is likewise clear from the affidavits and medical records that the correctional defendants were not in any way involved in decisions regarding medical treatment provided to inmates.

The record before the Court establishes that upon becoming aware of inmates starting fires in the RHU, correctional officers promptly extinguished the fires and afforded inmates in the unit the opportunity to receive medical treatment for their possible exposure to smoke. As to the September 22, 2018 incident, Adams was initially taken to the health care unit but medical personnel could not examine him as they were treating an inmate who had been stabbed. When medical personnel were ready to evaluate Adams he refused to be handcuffed to the back as directed by Defendant Lambert and thus refused the opportunity for evaluation by medical personnel. Adams' refusal to submit to handcuffs for transport to the health care unit does not indicate deliberate indifference by the

correctional defendants.  Upon his possible exposure to smoke on October 19, 2018 and October 22, 2018, correctional officers escorted Adams to the health care unit and medical personnel evaluated his condition.  The medical records further establish that throughout his confinement in the Restrictive Housing Unit Adams had access to medical treatment through the sick call process and routinely utilized this process to obtain such treatment. *Adams I,* Doc. 29-3, Doc. 29-4; *Adams II,* Docs. 13-2—13–11.

Adams has failed to establish deliberate indifference on the part of the correctional defendants. Assuming Adam's exposure to smoke constituted a serious medical need, he cannot show that any correctional defendant personally acted with deliberate indifference to his medical needs. Specifically, Adams has not demonstrated that the correctional defendants were aware of facts establishing "an objectively serious medical need" nor that these defendants disregarded any known serious risk to Adams' physical health. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (stating that for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (holding that defendant must have actual knowledge of a serious condition and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (finding that a failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference). Rather, the evidence reflects Adams was provided access to timely and appropriate medical care after exposure to smoke from fires set in the RHU in September and October of 2018.

To the extent Adams seeks to hold the correctional defendants liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> "[t]he law does not impose upon [correctional officials] a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [jail] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Finally, to the extent Adams seeks to hold a correctional defendant liable under a theory of respondeat superior or vicarious liability, he is entitled to no relief as the law is well-settled that liability in a 42 U.S.C. § 1983 action may not be based on either of these the theories. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (finding that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of respondeat superior."); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "officials are not liable under § 1983 for the unconstitutional acts of their subordinates [or co-workers] on the basis of respondeat superior or vicarious liability."). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability could attach to the correctional defendant only if they "personally participate[d] in the alleged

unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360. Since the correctional defendants did not participate in the provision of medical treatment to Adams, the Court addresses whether a causal connection existed.

To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Adams must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the correctional defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in [the alleged constitutional violation], or . . . facts [that] support an inference that [the correctional defendants] directed [medical personnel] to act unlawfully, or knew that [they] would act unlawfully and failed to stop [them] from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). Review of the pleadings and evidentiary materials submitted in these cases shows Adams has not met this burden.

The record contains no evidence to support an inference that the correctional defendants directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action. In addition, Adams present no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which the correctional defendants failed to take corrective action. Finally, the records before the Court demonstrate that medical personnel did not act pursuant to a policy enacted by the correctional defendants when deciding the course of medical treatment provided to Adams;

instead, they provided treatment to him in accordance with their professional judgment. Thus, the requisite causal connection does not exist in this case as to the correctional defendants and their liability under the custom or policy standard is likewise not justified. Moreover, "[i]n light of the Court's determination that there was no constitutional deprivation [as to the medical treatment provided to Adams], there is no basis for supervisor liability." *Nam Dang*, 871 F.3d at 1283, citing *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008); *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007).

There is no evidence the correctional defendants were deliberately indifferent to Adams' Eighth Amendment rights regarding the provision of his medical made the subject of his Complaints. Thus, Adams has failed to meet his burden of showing that the correctional defendants committed a violation of a constitutional right, and they are entitled to qualified immunity. *See Hope*, 536 U.S. at 736.

### ii.  The Medical Defendant

In response to the Complaints filed by Adams, Wexford submitted affidavits from Dr. Tahir Siddiq, the Medical Director at Bullock Correctional Facility, and Dr. Hugh Hood, the Regional Medical Director for Wexford. After a comprehensive review of the medical records submitted by Wexford, the undersigned finds the details of treatment provided to Adams as set forth by Dr. Siddiq and Dr. Hood in their affidavits are corroborated by the objective medical records contemporaneously compiled during the treatment process. *Adams I*, Doc. 12-1 at 14–97, and *Adams II*, Docs. 13-2—13-11.

As explained, Adams refused to leave his cell on September 22, 2018, for a medical evaluation after he started a fire in his cell, and Dr. Hood affirms Adams' medical records have no entry of him receiving medical care or treatment on that date. *Adams II,* Doc. 13-1 at 2, *Affidavit of Hugh Hood, M.D.* Adams' medical records, however, show he was seen and evaluated numerous times by medical staff throughout September and October of 2018, in response to various sick call requests he submitted. Medical staff also evaluated Adams on October 19 & 22, 2018, because of the fires set in a cell in the RHU on those dates. Doc. 29-3 at 13, 55. On neither occasion did medical personnel find Adams to have suffered any injuries or other health concerns. *Id.* Medical staff evaluated Adams on October 23, 2018, for his complaint of chest pains during which he informed the nurse he had inhaled some smoke. *Adams II,* Doc. 13-6 at 7. On examination, medical personnel noted that Adams' vital signs were normal and he made no complaint of discomfort. *Id.* Adams presented to the healthcare unit again on October 24 & 27, 2018, complaining of chest pain but no injuries or distress were noted by medical personnel. *Id.* at 9; Doc. 13-7 at 1. An EKG taken October 27, 2018, also failed to show Adams had any significant health problems or concerns in relation to his complaints of chest pain. Doc. 13-7 at 1.

Under the circumstances set forth herein, the undersigned finds that the course of treatment undertaken did not violate Adams' constitutional rights. Specifically, there is no evidence upon which the Court can conclude that medical personnel acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir.

1991) (internal quotation marks and citation omitted). Rather, the evidence before the Court demonstrates that, other than the September 22, 2018, incident, medical personnel evaluated Adams each time he reported to the health care unit. As to the September 22, 2018, incident, Adams did not appear in any distress and when offered transport to the health care unit for treatment but failed to comply with the order requiring he be handcuffed effectively refusing the opportunity for evaluation by medical personnel. Regarding Adams' medical evaluations after the October 19 & 22, 2018, incidents in the RHU, medical personnel provided treatment to him in accordance with their professional judgment based on his complaints. Whether they "should have [utilized] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted). Furthermore, to the extent the claims for relief presented by Adams sound in negligence or medical malpractice, neither of these constitutes deliberate indifference actionable in a § 1983 case. *Farmer*, 511 U.S. at 836; *Taylor*, 221 F.3d at 1258.

Here, the undersigned finds the medical treatment provided to Adams did not constitute a violation of his constitutional rights. Adams' conclusory assertions of inadequacy in the treatment provided to him do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead v, Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (explaining that "[a]lthough [Plaintiff] attempts to overcome summary judgment by offering his own sworn statement[s] . . . to support his

allegations, the contemporaneous medical records and opinions of the examining medical [professionals] show that this purported evidence is baseless."); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (where a party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Further, Adams presents no evidence that the treatment provided to him by medical professionals employed by Wexford created a substantial risk to his health and with this knowledge consciously disregarded such risk. The record is therefore devoid of evidence showing deliberate indifference to Adams' medical needs. Moreover, the law is settled that Adams is not entitled to relief from Wexford based solely on the actions of its employees. For § 1983 liability to attach to a private corporation providing medical care to inmates, a plaintiff must allege his constitutional rights were violated as a result of an established policy or custom of that corporation. *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997). And liability under § 1983 may not be based on Wexford's role as the employer or supervisor of the doctors or nurses who provided medical treatment to the plaintiff. *See e.g., Massey v. Montgomery County Detention Facility*, 646 F. App'x 777, 780 (11th Cir. 2016). Adams does not identify or challenge any policy of Wexford; instead, he only challenges the treatment provided to him by Wexford's employees, and as explained, medical personnel did not act with deliberate indifference. Consequently, Wexford is entitled to qualified immunity.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.     Defendants' motions for summary judgment (Docs. 12, 13, 29, 34) be GRANTED.

2.     Judgment be GRANTED in favor of Defendants.

3.     This case be DISMISSED with prejudice.

4.     Costs be taxed against Plaintiff.

It is ORDERED that **by February 3, 2022**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made.  Frivolous, conclusive or general objections will not be considered by the Court. This Recommendation is not a final order and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH Cir. R. 3–1. *See Stein v. Reynolds Sec., Inc*., 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done, this 20th day of January 2022.

    /s/   Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE